IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| KEVIN KING, <br><br> Plaintiff, <br><br> v. <br><br> DAVID PATT et al., <br><br> Defendants. | MEMORANDUM DECISION AND ORDER <br><br><br> Case No. 2:04-CV-829 TC <br><br> District Judge Tena Campbell |

Plaintiff Kevin King, an inmate at the Utah State Prison, filed this *pro se* civil rights suit under 42 U.S.C. § 1983. *See* 42 U.S.C.A. § 1983 (West 2012). Plaintiff was allowed to proceed *in forma pauperis* under 28 U.S.C. § 1915. *See* 28 U.S.C.A. § 1915 (West 2012). Before the court is Defendants' Motion for Summary Judgment. For the reasons set forth below, the Defendants' motion is denied.

## ANALYSIS

**I.    BACKGROUND**

Plaintiff filed this suit in 2004 alleging numerous constitutional violations including Eighth Amendment claims for denial of medical care while at the Washington County Jail. In 2006, the Complaint was dismissed without prejudice because it contained claims that were not exhausted through the administrative grievance process. Plaintiff later voluntarily dismissed his unexhausted claims and his Complaint was reinstated in early 2007. Defendants filed a *Martinez* Report (Doc. no. 56) addressing Plaintiff's allegations in August 2007 and a Supplemental

*Martinez* Report (Doc. nos. 61-64) in October 2007.  In September 2007, the Court dismissed several claims and defendants and appointed *pro bono* counsel to represent Plaintiff on his remaining claims.  (Doc. no. 60.)  Plaintiff's counsel entered their appearance in November 2007 and filed a detailed response to the *Martinez* Report in January 2008.  (Doc. no. 71.)  An initial scheduling order was entered in March 2008 setting deadlines for discovery and trial.  In June 2009, Adult Probation and Parole Officer (AP&P) Kim Seegmiller, the only state defendant, reached a settlement with Plaintiff and was dismissed from the case.  In December 2010, one month before the scheduled trial, Plaintiff's counsel moved to withdraw citing difficulties working with Plaintiff.  The motion to withdraw was referred to Magistrate Judge Paul M. Warner who ultimately granted the motion and presided over further discovery.  Defendants then filed the present motion for summary judgment, to which Plaintiff has responded *pro se.*

Plaintiff's two remaining claims allege cruel and unusual punishment under the Eighth Amendment based on failure to provide adequate care for a broken wrist and detached retina. The remaining defendants are all officials at the Washington County Jail where Plaintiff was being held on a parole violation.  They include the Jail Commander, Jon Neighbor, who allegedly denied Plaintiff's grievances regarding medical care; Nurse David Patt[1], who supervised and was directly involved with Plaintiff's care; Officers Spencer Dobson and Lyle Storey, who worked in the jail control room and to whom Plaintiff allegedly complained about eye problems; and, Officer Darrel McCoy, who also allegedly denied Plaintiff's medical requests.  Plaintiff seeks

---

[1] David Patt passed away during the pendency of this case and is now represented by his estate.

compensatory and punitive damages from Defendants in their individual capacities.

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses," *Cellotex v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553 (1986), thus, "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought." Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the initial burden of showing "that there is an absence of evidence to support the non-moving party's case." *Cellotex*, 477 U.S. at 325. This burden may be met merely by identifying portions of the record which show an absence of evidence to support an essential element of the opposing party's case. *Johnson v. City of Bountiful*, 996 F. Supp. 1100, 1102 (D. Utah 1998). Once the moving party satisfies its initial burden, "the burden then shifts to the nonmoving party to make a showing sufficient to establish that there is a genuine issue of material fact regarding the existence of [the disputed] element." *Id.* A fact in dispute is "material" only if it might affect the outcome of the suit under governing law. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997). The dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A nonmovant "that would bear the burden of persuasion at trial" must "go beyond the

pleadings and 'set forth specific facts' that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores*, 144 F.3d 664, 671 (10th Cir. 1998).  Mere allegations and references to the pleadings will not suffice. Instead, the specific facts put forth by the nonmovant "must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein." *Thomas v. Wichita Coca-Cola Bottling*, 968 F.2d 1022, 1024 (10th Cir. 1992).  Moreover, "the nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir .1991).  The court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999).  Conclusory allegations are given no weight, and "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient" to overcome a summary judgment motion.  *Anderson*, 477 U.S. at 249, 252.

### III.   MATERIAL FACTS[2]

Plaintiff was arrested on May 29, 2002, on a parole violation.  Before being booked into the Washington County Jail he was taken to Dixie Regional Medical Center for evaluation. There, Dr. Christensen diagnosed Plaintiff with a broken scaphoid bone in his wrist and gave him a splint and written instructions to see an orthopedic expert within 24-48 hours.  (Doc. no. 63,

---

[2] The facts presented here are drawn primarily from Defendants' *Martinez* reports (Docs. 56, 61-64) and Plaintiff's Response to Defendants' *Martinez* Reports (Doc. no. 71).  The facts are construed in the light most favorable to Plaintiff, the non-moving party.

Exs. A and B.)  Contrary to Dr. Christensen's instructions on the Medical Clearance Report, Plaintiff was never taken to see an orthopedist.  On June 6, 2002, Plaintiff was examined by Cecil Huff, a Registered Nurse and independent contractor hired to treat inmates at the jail.  It is disputed exactly why Plaintiff requested treatment at this time and whether he complained about his wrist.  Plaintiff asserts that he did seek treatment for his wrist, but, according to Huff's exam notes, Plaintiff only complained of back spasms and arthritis and was prescribed ibuprofen. Plaintiff asserts that due to the lack of followup care his wrist healed incorrectly causing permanent lack of mobility and pain in his wrist.

On June 15, 2002, Plaintiff was allegedly hit in the right eye by a handball while recreating at the jail.  Plaintiff did not immediately report this incident but soon after began having vision problems.  On August 2, 2002, Plaintiff filed a medical request form complaining of pain and vision problems in his right eye.  On August 5, 2002, Plaintiff was examined by Nurse Huff.  Defendant Patt, a Registered Nurse employed as the chief medical officer by the jail, also attended.  Huff noted a total lack of red reflex in Plaintiff's right eye and recommended that Plaintiff see an ophthalmologist but did not make an emergency referral.  According to medical literature a lack of red reflex is a known indication of a detached retina which warrants prompt followup care.  Although it is disputed who actually made the appointment,[3] Plaintiff was

---

[3] It is disputed whether the jail actually made this appointment or if the free clinic Plaintiff later visited on his own made the appointment.  Patt asserts that he made an appointment for the earliest possible time which was September 12th, although Plaintiff was not immediately told about this appointment for security reasons.  Director Felt of the Doctors' Free Clinic of St. George, states that she actually made this appointment after Plaintiff failed to attend an earlier appointment on August 28, 2002.

eventually scheduled to see an opthalmic surgeon, Dr. Snow, on September 12, 2002, which Patt later asserted was the earliest possible time Plaintiff could be seen.

On August 18, 2002, Plaintiff requested to see an eye doctor due to headaches and blurred vision. This request was denied by Defendant McCoy on the grounds that eye exams were allowed only once every six months and Plaintiff had only been at the jail for a few months. (Doc. no. 71, Ex. B-top.) Plaintiff submitted another medical request on August 21, 2002, which was denied by Patt, stating that Plaintiff would be taken to a specialist "on [the] next available opening." (Doc. no. 71, Ex. B-bottom.) That same day, Plaintiff complained to the control room officers on duty, Defendants Storey and Dobson, about headaches, nausea, dizziness and lack of vision in his right eye. Plaintiff's declarations state that Storey and Dobson refused to contact medical and instead mocked and teased Plaintiff. In his grievances, however, Plaintiff states that the officers contacted the medical department and were told that Plaintiff would be seen as soon as possible but apparently they never followed up. (Doc. no. 71, Ex. F at 2.)

On August 26, 2002, Plaintiff was placed in the jail's work release program which was supervised by Adult Probation and Parole. As a precondition for admittance to work release Plaintiff was required to sign a form stating that he would be responsible for his own medical care. On August 28, 2002, while on work release, Plaintiff visited the Doctors' Free Clinic of St. George complaining of failing eyesight and headaches which he stated had been occurring for about a month. On August 29, 2002, the director of the clinic, Ms. Felt, contacted the jail to confirm Plaintiff's emergency appointment with an eye specialist scheduled for the following day. (Doc. no. 71, Ex. D.) Plaintiff wound up missing this appointment because he was not

released from jail.  It is disputed whether Plaintiff was informed about this appointment and why he failed to attend.

On September 12, 2002, Plaintiff was examined by Dr. Snow who diagnosed Plaintiff with a detached retina and informed Plaintiff that due to the delay in getting treatment he may have permanent vision loss.  Dr. Snow emphasized the importance of immediate followup treatment to prevent Plaintiff's condition from deteriorating further.  Later that day Plaintiff filed a Level One grievance with the jail challenging Patt's medical qualifications and asserting that Patt's decision to delay treatment caused Plaintiff permanent injury.  After not receiving a timely response, Plaintiff filed another Level One grievance on September 26, 2002.  (Doc. no. 71, Ex. F.)  Upon his return to the jail that evening, he was given a urine analysis (UA) test.  On September 28, 2002, Plaintiff was told that his UA revealed the presence of illegal drugs and he was removed from work release and placed on lockdown.  Plaintiff was later told that the UA was, in fact, clean (i.e., no indication of drugs).

On September 30, 2002, Defendant Patt filed a written response to Plaintiff's grievances.  Patt rejected the assertion that he was unqualified, stating that he had twenty-five years of experience in critical care and emergency medicine.  Patt further explained that based on his experience he was fully aware following Plaintiff's initial eye exam of the seriousness of Plaintiff's condition and need for prompt treatment.  Patt expressed sympathy for Plaintiff's poor outcome, but asserted that Plaintiff was to blame for the lack of prompt followup care.  (Doc. no. 71, Ex. G.)

On October 1, 2002, Plaintiff was released from jail for an eye doctor appointment but

did not go to the appointment.  Plaintiff later told his probation officer that he did not attend the appointment because he had no money to pay for it.  Probation officers recorded other incidents where Plaintiff failed to attend eye appointments reportedly for the same reason.  (Doc. no. 71, Ex. I.)  On October 2, 2002, Plaintiff filed a grievance requesting that the jail pay for his eye treatment.  Jail Commander Jon Neighbor denied the grievance stating that Plaintiff was responsible for his own medical care because he was on work release.  (Doc. no. 59, Ex. K.)  On December 19, 2002, Plaintiff had an appointment to see a retinal expert in Nevada but was denied permission to travel out of state.[4]  That same day Plaintiff returned late to the jail for the second time, prompting his parole officer to initiate parole revocation proceedings.  Plaintiff stipulated to the violations and consented to being returned to prison where he could receive eye treatment.

     Following his return to prison Plaintiff was promptly referred for treatment at the University of Utah Moran Eye Center.  On February 28, 2003, Plaintiff had an initial consultation with Dr. Paul Bernstein and just over one week later underwent what the doctor described as "very aggressive surgery" in an attempt to repair the detached retina.  The surgery proved unsuccessful, however, and Plaintiff was left with only bare light perception in his right eye.  In a letter from Dr. Bernstein to Plaintiff dated June 27, 2003, Bernstein noted that "it is likely that [Plaintiff] would have had a better outcome had [he] been seen sooner.  We always prefer to repair retinal detachments soon after the first symptoms, because this maximizes the outcome."

---

[4] It is not clear who denied Plaintiff permission to travel or their reasons for doing so.

(Doc. no. 71, Ex. P.)  In a subsequent letter to Plaintiff dated May 27, 2004, Dr. Bernstein offered his expert opinion that "prompt medical care when [Plaintiff] first had [his] symptoms of flashes and floaters might have led to a much better outcome in [his] right eye."  (Doc. no. 71, Ex. Q.)

IV.   **LEGAL STANDARD FOR EIGHTH AMENDMENT DENIAL OF MEDICAL CARE CLAIMS**

In *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285 (1976), the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Estelle*, 429 U.S. at 104 (quoting *Greg v. Georgia*, 428 U.S. 153, 96 S. Ct. 2909 (1976)).  "Deliberate indifference involves both an objective and a subjective component." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).  The objective component is met if the deprivation is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970 (1994).  A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999).

The subjective component is met only if a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  Allegations of mere negligence in diagnosing or treating a medical condition, *Estelle*, 429 U.S. at 105, or "inadvertent failure to provide adequate medical care," *Riddle v. Mondragon*, 83 F.3d 1197, 1203 (10th Cir. 1996), are insufficient to state a

9

claim under the Eighth Amendment.

"Delay in [providing] medical care only constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm." *Sealock*, 218 F.3d at 1210. The Tenth Circuit has held that the "substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman*, 254 F.3d 949, 950 (10th Cir. 2001).

## V. SUMMARY JUDGMENT ANALYSIS

Defendants move for summary judgment asserting that Plaintiff has not presented sufficient evidence to support a finding that Defendants were deliberately indifferent to Plaintiff's serious medical needs. Defendants further assert that even if Plaintiff could show deliberate indifference, Defendants are entitled to qualified immunity because the rights at issue were not clearly established at the time of the alleged violations.

### A. Objective Component: Serious Medical Needs

Plaintiff has presented ample evidence to show that his wrist injury was sufficiently serious to satisfy the objective component of the relevant Eighth Amendment standard. The Medical Clearance Report given to Plaintiff before booking clearly shows that Plaintiff was diagnosed with a broken scaphoid bone which required prompt followup treatment (within 24-48 hours). Although Defendants admit that Plaintiff did not receive the prescribed followup care, they attempt to minimize the seriousness of his medical condition by asserting that there is no record Plaintiff ever formally complained of any wrist problems. This argument is wholly unpersuasive. Plaintiff did not need to formally request further wrist treatment, because he

arrived at the jail directly from the hospital bearing a Medical Clearance Report detailing his injury and need for specific followup care.[5] This document put jail officials on notice that Plaintiff had a serious injury which was "diagnosed by a physician as mandating treatment." *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999). At most, Defendants' assertions to the contrary call into question the efficacy of the clearance process itself. Thus, Plaintiff's wrist injury was objectively serious enough to invoke constitutional protections.

There is also sufficient evidence to support the finding that Plaintiff's eye injury was sufficiently serious to implicate the Eighth Amendment. The record shows that Plaintiff suffered from a detached retina while at the jail. Such an injury, which may permanently impair or destroy a person's vision (even in one eye), is extremely serious. Defendants dispute when the injury occurred and when they first became aware of it, but they do not deny that it existed during Plaintiff's confinement at the jail and do not suggest that such an injury is merely *de minimis* or unworthy of constitutional protection.

### B. Subjective Component: Deliberate Indifference

To satisfy the second prong of the cruel and unusual punishment standard, the record must support a finding that Defendants were deliberately indifferent to Plaintiff's medical needs. This requires a showing that Defendants knew of and disregarded Plaintiff's needs for medical treatment. *Farmer*, 511 U.S. at 837. The Court will address the evidence of deliberate

---

[5] Plaintiff asserts that he was not given a copy of the report at the time of his booking and that he was unaware of the specific treatment recommendation made by Dr. Christensen until much later, when he obtained the report through a records request. By then, however, his wrist had, allegedly, already healed incorrectly.

indifference as to each of Plaintiff's injuries.

        **1.**      **Wrist Injury**

Defendants move for summary judgment on this claim asserting that "there is no evidence that [they] were even aware of Plaintiff's injured wrist, much less his alleged need for medical treatment." (Defs.' Mem. Supp. Summ. J. (Doc. no. 172) at 16.) As previously discussed, this assertion ignores the Medical Clearance Report presented to jail officials when Plaintiff arrived at the jail. That report states that Plaintiff had a broken wrist which required specific followup treatment within 24-48 hours. Assuming that jail policy requires arrestees arriving from a hospital to have medical clearance before being booked into the jail, Defendants can hardly maintain that nobody at the jail received or reviewed Plaintiff's Medical Clearance Report. Indeed, it is unclear what purpose the report would serve if it were not closely reviewed by jail personnel at the time of booking.[6] Moreover, a jury could reasonably conclude that the willful failure to review and act upon the report by itself amounted to deliberate indifference. Thus, the Court finds that the Medical Clearance Report is sufficient to create a genuine issue of material fact as to whether defendants were aware of and disregarded Plaintiff's need for followup treatment for his broken wrist.

---

    [6] The record is not clear who exactly was responsible for reviewing and following up on the Medical Clearance Report. Presumably, this task would have been within David Patt's purview as the chief medical officer on staff. In any case, Defendants have not identified anyone else responsible for doing so. Moreover, Jon Neighbor, as Jail Commander, was presumably responsible for establishing and implementing policies and procedures for handling such matters.

### 2. **Eye Injury**

Regarding Plaintiff's eye injury, Defendants assert that summary judgment is appropriate because the record does not show that they were aware of the specific nature of Plaintiff's injury and need for immediate treatment. Defendants contend that while they "may have known about Plaintiff's general complaints with respect to his eyes . . . [such] general complaints are not enough to establish their deliberate indifference . . . ." (Doc. no. 172 at 17.) Defendants further assert that they made reasonable efforts to get Plaintiff to an eye specialist but Plaintiff did not fully cooperate. Finally, Defendants contend that they are entitled to qualified immunity because the relevant standard of care was not clearly established when Plaintiff's claims arose.

Defendants' assertion that they were only generally aware of Plaintiff's eye problems is not supported by the record. Instead, the record shows that on August 5, 2002, Nurse Huff noted a total lack of red reflex in Plaintiff's right eye which, according to medical literature presented by Plaintiff, is a well-known indication of a serious medical condition requiring prompt followup treatment. Although Huff is not a defendant here, the record shows that Defendant David Patt also attended this eye exam and reviewed Huff's findings. Moreover, Patt admitted in his grievance response that after the eye exam he was aware of the seriousness of Plaintiff's symptoms and need for prompt followup care. Thus, Defendants argument that they lacked specific knowledge of the seriousness of Plaintiff's eye injury is unavailing.

The record also raises serious factual questions regarding the adequacy of Defendants' efforts to obtain treatment for Plaintiff. Defendants assert that they cannot be found deliberately indifferent because they scheduled Plaintiff to see an eye specialist at the "earliest possible time,"

13

and because once Plaintiff was placed on work release his medical care was no longer their problem.  Neither of these arguments is persuasive.  The fact that Plaintiff was able to get an earlier appointment with an eye specialist through the free clinic, just days after being placed on work release, casts serious doubt on Defendants' assertion that September 12, 2002 (almost six weeks after his initial exam) was the earliest possible time Plaintiff could have received followup treatment.  Moreover, the circumstances surrounding Plaintiff's placement on work release, and the apparent interference or lack of cooperation with his efforts to obtain treatment on his own, lend support to Plaintiff's argument that work release was merely a tactic to avoid providing costly medical treatment to Plaintiff.  Thus, genuine issues of material fact remain which preclude a finding that Defendants were not deliberately indifferent to Plaintiff's need for eye treatment.

      C.    **Qualified Immunity**

The doctrine of qualified immunity shields government officials from individual liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).  Qualified immunity is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go trial."  *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001)(*quoting Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  Thus, immunity questions should be addressed at the earliest possible stage in litigation.  *Id.* (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)(per curiam)).

Given the underlying purposes of qualified immunity, courts address qualified immunity questions differently from other summary judgment decisions. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). By asserting qualified immunity a defendant places a "heavy two-part burden" upon the plaintiff. *Id.* The plaintiff must establish that the facts, taken in the light most favorable to him, show that the officer's conduct violated a constitutional or statutory right, and, that the right in question was clearly established at the time of the alleged violation. *Saucier*, 533 U.S. at 201. The determination whether a right is clearly established must be made "in the light of the specific context of the case, not as a broad general proposition." *Id.* And, "the relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. If the plaintiff cannot satisfy either part of this "heavy two-part burden," the court must grant the defendant qualified immunity and dismiss the deficient claims.

Defendants assert that even if Plaintiff could show deliberate indifference they are entitled to qualified immunity because the rights at issue here were not clearly established at the time of the alleged violations. It is not entirely clear from Defendants' summary judgment briefs whether qualified immunity is invoked as to all of the remaining claims and defendants. Defendants' primary argument is that they were not obligated to pay for Plaintiff's medical care while he was on work release and that even if such a right existed it was not clearly established at the time. Although this argument appears relevant only to Plaintiff's eye injury claim, the court will assume a broad invocation of qualified immunity as to all remaining claims and defendants.

As previously discussed, the record here is sufficient to create genuine issues of material

fact concerning whether Defendants were deliberately indifferent to Plaintiff's serious medical needs.  Consequently, the only question remaining for qualified immunity purposes is whether Plaintiff's right to medical care was sufficiently well-established at the time that a reasonable officer in each Defendants' position would have know that his conduct was unlawful in the situation he confronted.  This standard is clearly satisfied with regard to Plaintiff's wrist injury claim.  Under then-existing precedent it was well-established that a "serious medical need" was one which had been "diagnosed by a physician as mandating treatment."  *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999).  Because Plaintiff's wrist injury clearly fit this criteria, Defendants should have known that deliberate indifference to providing the prescribed followup treatment would violate the Eighth Amendment.  Whether the failure to provide the necessary followup care here resulted from deliberate indifference raises questions of fact which can only be resolved by a jury.

   The same is true regarding Plaintiff's eye injury.  The evidence here supports the finding that trained medical personnel had observed symptoms of a serious problem with Plaintiff's right eye (total lack of red reflex) which warranted immediate followup treatment.  Once again, under existing law it would have been clear to any reasonable officer that deliberate indifference to providing the necessary followup treatment was unlawful.  And, there is sufficient evidence here to create a genuine issue of material fact as to whether the failure to provide followup care resulted from deliberate indifference.

   Defendants argument that it was not clearly established at the time that they had an "obligation to provide medical care for Plaintiff while he was on work release, much less pay for

16

that care," (Doc. no. 172 at 21) is unavailing for two reasons. First, it overlooks Plaintiff's claim that failure to provide prompt treatment before granting work release violated the Eighth Amendment. And, second, it ignores the possibility that placing Plaintiff on work release, despite knowledge of an urgent, preexisting condition for which Plaintiff could not obtain care on his own, might itself amount to deliberate indifference.

Thus, the Court finds that Defendants are not entitled to qualified immunity and summary judgment for Defendants is not appropriate.

## VI. FURTHER PROCEEDINGS

### A. Plaintiff's Recent Motion for Partial Summary Judgment

On May 11, 2012, Plaintiff filed a document styled "Motion for Partial Summary Judgment for Liability." (Doc. no. 194.) Although this appears to be a cross-motion for summary judgment, it is clearly untimely as the deadline for such motions under the current scheduling order has long since expired. Moreover, the motion is not properly supported as required by the Federal Rules of Civil Procedure or the local rules. And, given the genuine issues of material fact noted above, which can only be resolved through trial, it is doubtful that Plaintiff's motion would help move this case forward. Thus, Plaintiff's motion will be lodged in the file and Defendants are not be required to respond. If the court concludes that such a motion would be helpful at a later date, it will instruct Plaintiff to refile with proper documentation at the appropriate time.

### B. Appointment of Counsel

Based on the denial of Defendants' motion for summary judgment, the court finds that

appointment of pro bono counsel to assist Plaintiff with trial preparation is warranted. Accordingly, the Clerk's Office is instructed to find suitable counsel to represent Plaintiff on a *pro bono* basis. Once Plaintiff's counsel has made an appearance, this case will be scheduled for a settlement conference and, if necessary, for trial. Plaintiff is warned that failure fully cooperate with his appointed counsel may, once again, result in the withdrawal of legal assistance, which will likely seriously impact the outcome of this litigation.

## ORDER

Accordingly, **IT IS HEREBY ORDERED** that:

(1) Defendants' Motion for Summary Judgment (Doc. no. 171) is **DENIED**;

(2) Plaintiff's Motion for Partial Summary Judgment on Liability (Doc. no. 194) is untimely and so will be **LODGED**; and,

(3) the Clerk's Office shall find suitable counsel to represent Plaintiff on a *pro bono* basis.

DATED this 22nd day of May, 2012.

BY THE COURT:

*/s/ Tena Campbell*
_____
TENA CAMPBELL
United States District Judge